James B. CHAGNON, Plaintiff-Appellant,

v.

SHAMPAINE INDUSTRIES, INC.,
Defendant-Respondent.

No. 32388.

St. Louis Court of Appeals.
Missouri.

Feb. 21, 1967.

Shifrin, Treiman, Schermer & Susman,
Mellitz, Mass, Agatstein & Frank, St.
Louis, for plaintiff-appellant.

Norman Bierman, Anderson, Gilbert, Wolfort, Allen & Bierman, Stuart M. Haw, Jr., St. Louis, for defendant-respondent.

RUDDY, Judge.

Plaintiff brought this action to recover commissions alleged to be due him as a salesman for defendant upon orders procured prior to the termination of his employment, but which were shipped thereafter. The jury found in favor of plaintiff in the principal sum of $3490.87, with interest of $523.60, aggregating $4014.47. The trial court sustained defendant's motion for judgment in accordance with its motion for a directed verdict offered at the close of the entire case and overruled defendant's motion for a new trial. Plaintiff appealed.

The questions for determination are:

1. Does the evidence support plaintiff's contention that the entire contract of employment was made orally on or about March 1, 1961, and that the said contract did not include the termination clause of the 1961 or 1962 Sales Compensation Plan which provided for forfeiture of commissions on orders procured prior to the termination of plaintiff's employment, but which were shipped thereafter? or,

2. Was plaintiff's employment governed by the terms and conditions of the Sales Compensation Plan in effect on May 25, 1962, the date of the termination of his employment, which included the termination clause? And if so,

3. Did the termination clause, paragraph 28 of the 1962 Sales Compensation Plan, bar plaintiff's claim to commissions on orders procured prior to the termination of his employment, but which were shipped thereafter?

We now look to the evidence for the answers. At the threshold of our summation of the evidence, we point out that the amount of the commissions due, if plaintiff is entitled to recover, is not in dispute and involves orders for merchandise received before termination of plaintiff's employment and shipped thereafter.

Plaintiff was employed by defendant as a sales representative in June, 1960. The territory assigned to him was Greater St. Louis, which plaintiff said comprised the City and County of St. Louis and East St. Louis. He was placed on a straight salary basis of $800 per month, plus reimbursement for business and traveling expenses incurred by him. This was his sole compensation irrespective of how much or how little merchandise he sold. This salary basis continued until on or about March 1, 1961.

On or about March 1, 1961, plaintiff had a conversation with Mr. Albert C. Einstein relative to a different form of compensation. Mr. Einstein was the General Sales Manager of the defendant company and was plaintiff's superior from the very beginning of his employment. Plaintiff testified that he made the request of Mr. Einstein, " * * * that I be considered to change my method of compensation from straight salary to a reduced salary plus commissions on the products sold." Plaintiff gave the following testimony regarding the conversation he had with Mr. Einstein:

"The conversation was relatively simple in that Mr. Einstein was very agreeable to going ahead and changing my method of compensation because the change to the other plan permitted higher earnings for me provided my sales continued as well as they had. So at this meeting we negotiated my base income, which then became $400.00, satisfactory to myself and Mr. Einstein, and then I was to earn commissions on products the company manufactured, at various rates I knew were customary with other men selling on straight commission.

"Q. Were you familiar with the rates of commissions that other sales representatives were paid, who worked on a commission basis?

"A. Yes, I was.

"Q. Did you say anything to Mr. Einstein in that connection, or he say anything to you?

"A. No, we didn't discuss, specifically, commission rates because we both had worked under it and I knew the rates."

Plaintiff did not recall whether he told Mr. Einstein that he knew the rates, but he believed that both of them assumed that plaintiff knew the rates because he had been employed for nine months. He said the rates varied from 2½% to 4% on various products, stating that the 2½% rate applied to heavy equipment and the 4% rate applied to the smaller items. In this conversation nothing was said about the territory he was to service. He testified "I continued with the same one." In further enlargement on the commission rates that he believed Mr. Einstein assumed that he (plaintiff) knew, he said that he was to receive full commission for merchandise sold by him and delivered in his territory. If he sold something to a dealer in his territory which was to be delivered in another territory he received one-third of the commission and the sales representative in the other territory received two-thirds of the commission. If a sales representative outside of his territory sold something which was delivered in his territory he received two-thirds of the commission and the other sales representative received one-third of the commission. He explained, "That, essentially, was the plan."

His commission was paid to him on the month following the date of delivery of the merchandise sold. He said he continued to work thereafter upon the basis outlined above.

During his cross-examination plaintiff testified that his conversation on or about March 1, 1961, with Mr. Einstein, was a "relatively simple conversation" in that he had conferred with Mr. Einstein "Approximately fifteen minutes." He said that they did not discuss specific commission rates because he knew the rates. He was asked, "And what other specific things did you discuss at that meeting with regard to your new—", and he answered, "Very little else that I recall. The essential part of the conversation was the request of change in my compensation plan from essentially what was known as a salary basis to a commission basis." Upon further inquiry during his cross-examination about the conversation he had with Mr. Einstein, plaintiff said, "I had an oral discussion with Mr. Einstein which was nothing more than a switchover from the straight salary basis to a commission plan the company had in existence, and this was agreed upon as to the effective date this would take place, and nothing else." At this point in his testimony he added that he did request a territorial increase and that Mr. Einstein said he would discuss that with him later. Plaintiff admitted that the conversation he had with Mr. Einstein, which he described as an "oral contract," did not define his duties nor his territory. It appears that Mr. Einstein left the defendant company in July of 1961. Plaintiff testified that he did not tell anyone else about his "oral contract" with Mr. Einstein.

About January 1, 1961, which was prior to the conversation plaintiff had with Mr. Einstein, plaintiff received a letter dated December 28, 1960, which, in part, read as follows:

"At the meeting between yourself and your regional manager, you were assigned the following quotas for the sales year commencing January 1st and continuing through December 31, 1961. (Then followed fourteen product lines with the quotas for each product.)

"Attached for your convenience is a copy of the Shampaine Industries

'Sales Compensation Plan'. As long as you are compensated on a salary plus travel expense basis, the Commission rates listed therein do not apply. * * *

\* \* \* \* \* \*

"Your base pay for 1961 will be $800.-00 per month.

"We wish you a very happy and prosperous 1961.

"Sincerely,
/s/ A. C. Einstein
General Sales Manager."

Attached to the aforesaid letter and received by the plaintiff was the "Sales Compensation Plan" dated January 1, 1961.

About two days after the conversation plaintiff had with Mr. Einstein on March 1, 1961, he received another copy of the January 1, 1961, Sales Compensation Plan which was mailed to him by Mr. Einstein. It was a copy of and similar in all respects to the Sales Compensation Plan he received about January 1, 1961.

The plan consisted of nine pages, parts of which we quote verbatim, while other parts we merely describe.

The plan applied to all sales representatives. It provided for an annual salary which was compensation for service calls made within the district at the direction of the regional sales manager, and for calls made on Federal, State and Municipal Institutions.

Paragraph 2 provided: *"Commissions on Sales are paid under the terms and conditions of this Plan."* (Emphasis ours.)

Paragraph 3 provided: "Bonus Commissions are paid on sales in excess of product category quotas as specified in this Plan."

Paragraph 4 provided: "Planned Incentive Payments are made for balanced selling achievement as specified in this Plan. All compensation will be paid by Shampaine Industries."

The products covered by the plan were described, as well as the "Salesman's Duties and Responsibilities." It provided that the annual sales quota for each of the product categories will be assigned.

Paragraph 9 provided: "Orders taken by the salesman are subject to acceptance by the Home Office. *Commissions and quota credits are earned when orders are shipped.* * * *" (Emphasis ours.)

The plan also provided for commissions payable on orders taken in one district for shipment into another. This commission was payable as explained by plaintiff in his testimony and heretofore referred to. It provided for a determination of commission and quota credits in other areas not referred to in the plan.

Paragraphs 15, 16, and 17 of the plan outlined the commission rates. Of particular interest to us is the following from Paragraph 15:

"Effective January 1, 1961, the salesman will be paid 2½% commission on all orders *received and shipped* on or after that date which are credited to the sales quota, *except as otherwise provided in this Plan* and with the following specific exceptions:" (Thereafter follows other categories of sales with different rates of commission.) (Emphasis ours.)

Other provisions in the plan provided for the manner in which bonus and incentive payments may be earned.

Paragraph 22 provided that payments of compensation for annual salary will be made every other Friday and that: "Regular Commissions: within approximately two weeks after the end of the month in which shipment is made."

It was further provided that bonus commissions and planned incentive payments would be made within sixty (60) days after the close of the sales year.

There were further provisions for reimbursement of certain expenses and for vacations.

Paragraph 28 was as follows:

*"Termination*

"When a salesman's employment terminates for any cause whatsoever, he will be entitled to receive commissions on merchandise shipped to date of termination only. He will receive bonus commissions and planned incentive payments only on shipments to date of termination."

Paragraph 29, the concluding paragraph, provides:

"When a salesman leaves the employ of the Company, he must return those items on his receipt memo, or these will be charged against his final check."

Attached to the Sales Compensation Plan was a sheet setting out the policy for authorized expense accounts and another sheet titled "Correspondence Guide for Salesmen."

Plaintiff testified that when he received the Sales Compensation Plan he read the first several pages that referred to commissions, but did not read the plan in its entirety. However, in his cross-examination his attention was called to the various provisions of the plan and he acknowledged reading virtually all of them with the exception of Paragraph 28 and he admitted that all of his commissions, his bonus commissions and his planned incentive payments would be paid "under the terms and conditions of this Plan" and "as specified in this Plan." He admitted reading Paragraph 15 and the exception noted therein. Plaintiff admitted that his compensation was paid under the plan and that he earned and received approximately $1700 as bonus and incentive payments in addition to his commissions in 1961. He admitted earning $13,000 in bonuses and commissions in 1961 and said that this did not include the bonus payment which he received in March of 1962 of $1700. When his attention was called to Paragraph 28, the termination clause, he was asked, "Did you at that time read Paragraph 28?" "A. I did not sir."

Plaintiff admitted that all of his duties and what he could expect to receive by way of commissions, bonuses and incentive payments and the manner in which they could be earned, and the reimbursement for expenses he incurred, were all in the written "Sales Compensation Plan" which plan, he admitted, applied to all sales representatives of Shampaine Industries. He said there was a schedule of commission rates which was in effect for every commission salesman of the company

" * * * and that's what I understood when I talked to Mr. Einstein. It was as simple as that. I accepted the commission rates, so whether they changed in '61 or '62, the commission rates were in effect and under which I worked.

"Q. And those commission rates and bonus requirements were spelled out in the Sales Compensation Plan which was then in effect and which was sent to you two days later; correct?

"A. All that material was in the plan."

Sometime in 1961 plaintiff's sales territory was increased to include, in addition to the greater St. Louis area, the southern portion of Illinois, the southern portion of Indiana, and a portion of Kentucky.

Shortly after January 1, 1962, plaintiff received a letter dated January 1, 1962, from Kurt F. Vogt, Director of Marketing as follows:

"The following quotas will apply to your district for the sales year commencing January 1st and continuing through December 31, 1962: * * *.

"Attached for your convenience is a copy of the Shampaine Industries 'Sales Compensation Plan'. You are invited to familiarize yourself with this thor-

oughly. Commission rates listed will apply to all orders shipped after January 1, 1962, as well as to all orders received after that date.

"Your base pay for 1962 will be $400.00 per month.

"We wish you a very happy and prosperous 1962."

Attached was the "Shampaine Industries Sales Compensation Plan" for the year 1962. The form of the 1962 Sales Compensation Plan was essentially the same as that of the 1961 plan. Plaintiff admitted that the product lines mentioned and the quotas did vary in 1962, and that the 1962 plan showed some additional products and also omitted some that had appeared in the 1961 plan. The total quota for 1962 was indicated at $461,000 as compared to $236,000 for the year 1961. Plaintiff was asked:

"Q. Did you read this plan over carefully?

"A. Only the portions pertaining to commission rates and bonus incentive plans, sir.

"Q. Well, there were some changes made in commission rates, were there not?

"A. I just said I read that portion, sir, because that was the basis on which I earned my living."

Plaintiff admitted that there were a number of changes made in the 1962 plan in connection with the bonus and incentive payments. He pointed out that the possible incentive payment he could earn in 1962 was $3100.00, whereas it was less than that in 1961.

Paragraph 28, the termination clause, was the same in the 1962 plan as it was in the 1961 plan. When plaintiff was asked if he familiarized himself with the plan, as he was invited to do in Mr. Vogt's letter, he answered, "I did not, sir. I read it piecemeal as it affected what I needed primarily my earning ability." He admitted that he was paid the basic salary and the various commissions as modified by the January 1, 1962 plan and was paid in accordance with the schedule of rates applicable in the 1962 plan. Plaintiff testified:

"There is a schedule of commission rates which were in effect for every commission salesman of the company, and that's what I understood when I talked to Mr. Einstein. It was as simple as that. I accepted the commission rates, so whether they changed in '61 or '62, the commission rates were in effect and under which I worked."

He said it was precisely correct that he agreed to work for the same rate as other salesmen received.

"Q. You would be susceptible to any changes—

"A. That's right. There was no specific talk about it, it was the schedule in effect under which the rest of the sales force operated under, whatever it was."

He again said that he did not read Paragraph 28, the termination clause, and that the first time he read it was after the termination of his employment. Plaintiff's employment was terminated on May 25, 1962.

In defendant's case Alfred C. Einstein testified, through his deposition, that prior to changing plaintiff's basis of payment from a straight salary to a commission basis, which would have been partially salary and commission, he would have had a conversation with plaintiff, such as plaintiff related in his testimony. He did not remember the date of the conversation. He said that plaintiff was to receive "our standard commission, whatever it was," as provided in the Sales Compensation Plan of January 1, 1961. He said he was sure that he mentioned the 1961 Sales Compensation Plan. When he was asked if he excluded from the conditions and terms of

plaintiff's compensation plan any of the provisions of the 1961 Sales Compensation Plan, he answered, "I never had an exception with any salesman at Shampaine to our compensation plan with the exception of one." He said plaintiff was not the exception. He said that plaintiff never did complain to him about the Sales Compensation Plan or the terms and conditions thereof and that plaintiff never questioned any of the provisions of the plan. Plaintiff never raised any questions concerning Paragraph 28, the termination provision. When the witness was asked if any written contract was entered into which spelled out all of the terms and conditions of the employment, he answered, "He would be written a letter and sent the compensation plan. That would be our contract. That was the extent of any contract." The witness further said, "We had a loose contract arrangement. And by the same token we didn't bind our people not to work for a competitor. It works both ways. You will find more stringent contracts in our industry that are non-competing contracts." He said in addition to the Sales Compensation Plan, the salesman was told in covering letters what his territory was and that he always received a salary. He said the salary was part of the plan, but that the salaries differed among the sales people. Because the salaries and the territories differed they were not mentioned in the plan. Also the quotas were not in the plan because they differed. Witness said that he was sure that he did not go into all of the terms and conditions of plaintiff's employment during the oral conversation he had on or about March 1, 1961.

Robert A. Romberger, Western Regional Sales Manager of defendant company, and Irvin L. Schulte, Comptroller and Assistant Secretary-Treasurer of said company, testified they met with plaintiff after the termination of his employment to go over his account. At the close of their discussion plaintiff was given a check in the amount of $792.89 for commissions and expenses due. On a later date plaintiff was sent a check to cover severance allowance of one month's pay and a check for three weeks vacation. During the aforesaid discussion plaintiff made certain claims for expenses, but no claim was made at that time for other commissions.

Kurt F. Vogt testified that he succeeded Mr. Einstein and that he had signed and forwarded the letter dated January 1, 1962, together with the attached Sales Compensation Plan, to the plaintiff. He said similar letters were sent to all sales representatives of the company and that the Sales Compensation Plan was identical for all of the salesmen. He testified that he told plaintiff his services were terminated. Plaintiff did not make any statement about commissions coming to him for orders shipped after the date of termination, nor did he make any claims as to future orders.

■ We proceed to answer the first question posed at the beginning of this opinion. It is plaintiff's contention that the undisputed evidence shows that a complete contract of employment was made orally in the conversation he had with Mr. Einstein on or about March 1, 1961, and that said contract did not include the termination clause contained in the 1961 and 1962 Sales Compensation Plan. Plaintiff contends there is no dispute of fact in the evidence and whether or not an oral contract of employment was created and effected by the conversation on or about March 1, 1961, was for the court to decide and not the jury. We agree with this contention. All the testimony about the language used in and the scope and extent of the conversation came from plaintiff and was wholly uncontradicted. Thus the first question presented is one of law. Young v. Van Natta, 113 Mo.App. 550, 560, 88 S. W. 123; Willard v. A. Siegel Gas-Fixture Co., 47 Mo.App. 1, 7.

■ We see no need to include in our discussion of this first question a repetition of the pertinent conversation. We think it is obvious that the conversation merely

determined nothing more than, as testified to by plaintiff, "a switchover from straight salary basis to a commission plan * * *." Plaintiff's testimony "that Mr. Einstein was very agreeable to going ahead and changing my method of compensation" and that he and Mr. Einstein assumed that plaintiff knew the rates of commission, was testimony of mere conclusions on plaintiff's part and was not testimony showing a meeting of minds. This is not testimony that would effect a complete oral contract of employment. All that is shown by the testimony of plaintiff as to the conversation he had with Mr. Einstein was that he asked Mr. Einstein to consider a change in his method of compensation from straight salary to a reduced salary plus commissions on the products sold. Plaintiff said, " * * * we didn't discuss, specifically, commission rates * * *." Plaintiff's testimony affirmatively shows that the conversation was silent about specific commission rates, bonuses and incentive payments; how and when these commissions, bonuses and incentive payments were to be paid; his duties and responsibilities under the changed plan of compensation; his quotas and his quota credits; the commissions, he acknowledged receiving, for merchandise delivered in his territory but sold by a salesman outside of the territory; and commissions payable to him for merchandise he sold in his territory to be delivered outside his territory; what expenses would be reimbursed; his right to a vacation and the period of vacation; as well as his right to recover commissions on merchandise shipped after his employment terminated. None of these matters was discussed, let alone agreed upon. An agreement on most of these matters, if not all, was essential to effect a complete oral contract of employment. In order to constitute a contract, there must be a mutual understanding of the facts entering into such contract and nothing can be left to conjecture. Sample v. Bank of Poplar Bluff, 239 Mo.App. 1152, 207 S.W.2d 55, 56. We observe that if plaintiff knew the commission rates at the time of his conversation with Mr. Einstein, and that Mr. Einstein assumed that he knew these commission rates, this knowledge upon the part of both parties could only come from the fact that Mr. Einstein had forwarded to plaintiff, prior to the conversation, a copy of the Sales Compensation Plan of January 1, 1961, which plaintiff acknowledged receiving.

■ Plaintiff's theory in the trial court and in this court is that he entered into a *complete* oral contract of employment in the conversation he had on or about March 1, 1961, and that compensation for his services as a salesman was to be based solely and exclusively according to the terms and conditions agreed upon in the conversation until the date of his discharge, and that the oral contract did not include the termination clause referred to. At the risk of seeming to belabor the point, we again say, that contrary to plaintiff's contention his testimony shows that at the time of the conversation relied on he did not discuss commission rates or all of the terms and conditions of employment. As a matter of fact plaintiff's testimony of the conversation does not recite what was said by the parties. His testimony in this regard states his conclusions of what transpired, nothing more. When he was asked what other specific things were discussed, he said, "Very little else that I recall. The essential part of the conversation was the request of change in my compensation plan from essentially what was known as a salary basis to a commission basis." We rule that the evidence does not support plaintiff's contention that the *entire* contract of employment was made orally on or about March 1, 1961.

In answer to the second question posed at the beginning of our opinion we rule that plaintiff's employment was governed by the terms and conditions of the Sales Compensation Plans in effect in 1961 and 1962. His employment was governed by the terms and conditions of the applicable plan until the date of the termination of his employ-

ment, namely, May 25, 1962, and included the termination clause. We shall proceed to show why we think plaintiff's employment was governed by the terms and conditions of the Sales Compensation Plans in effect during 1961 and 1962.

Plaintiff admitted receiving the 1961 "Sales Compensation Plan" several days after his conversation with Mr. Einstein. He first said he did not read it in its entirety and later admitted reading virtually all of the 1961 and 1962 Sales Compensation Plans, except Paragraph 28. He was familiar with the parts of each plan that provided for his annual salary; his commissions and the terms under which they were paid; his bonus commissions and his planned incentive payment; his duties and responsibilities as a salesman; his annual sales quota for each of the product categories he sold; the method of determining his incentive payments; the provision for reimbursement of certain expenses; and, a provision for vacations. He was familiar with all of these provisions in the plan, except that contained in Paragraph 28. He admitted that his salary, commissions, and incentive payments were all paid according to the plan. He also admitted that the Sales Compensation Plan applied to all sales representatives of the Shampaine Industries. He said there was a schedule of commission rates in effect for every commission salesman. He said "I accepted the commission rates, so whether they changed in 1961 and 1962, the commission rates were in effect, and under which I worked." He said it was precisely correct that he agreed to work for the same rate as other salesmen received, and that he was susceptible to any changes that were made. This was verified in the testimony of Mr. Einstein, with the exception of the provision contained in Paragraph 28. It will be recalled that Mr. Einstein testified that nothing was excluded from the Sales Compensation Plan concerning plaintiff's compensation, and that plaintiff never questioned any of the provisions of the plan. Plaintiff admitted re-

ceiving the letter from Kurt F. Vogt about January 1, 1962, which invited him to familiarize himself thoroughly with the contents of the Sales Compensation Plan. He admitted that the product line mentioned and the quotas set in the 1962 plan varied from the 1961 plan; that the 1962 plan showed some additional products and omitted some that had appeared in the 1961 plan.

Plaintiff admitted that during 1962 all compensation he received was paid according to the 1962 plan and that he performed services as required by and in accordance with the terms and provisions of the 1962 plan. Plaintiff's uncontradicted testimony shows that by his performance under the 1961 and 1962 plans, and his numerous admissions of acceptance of benefits in accordance with the income provisions of the plans, that he agreed to and accepted the 1961 and 1962 Sales Compensation Plans. At the time of his discharge he was bound by all of the provisions of the 1962 Sales Compensation Plan. Kurt F. Vogt's letter of January 1, 1962, with the 1962 Sales Compensation Plan attached, constituted an offer of a contract of employment to plaintiff for the period commencing January 1, 1962, and plaintiff's performance under the plan was an acceptance of all the terms of the contract. Hahn v. Forest Hills Construction Company, Mo.App., 334 S.W.2d 383, l.c. 385. Plaintiff can not now be heard to say that he did not read Paragraph 28 of the contract providing for commissions on merchandise shipped to date of termination only. Plaintiff can not accept the benefits under the contract and seek to escape provisions not beneficial to him by merely pretending that he did not read this provision. As we have said, plaintiff having accepted the benefits of the contract is bound by all the provisions contained in the contract. Ragen v. Schreffler, Mo., 306 S.W.2d 494, l.c. 499.

We now discuss the third and final question we posed. It is the contention of

plaintiff that even if the termination clause is considered part of the employment contract, that a fair construction of the clause would be that it merely postponed plaintiff's rights to commission, until the orders procured by him were shipped, although shipped after termination. In support of this he says that the word "When" at the very beginning of the clause is an adverb and means "at the time." Further contending that any other construction of the clause would work a forfeiture, which is not favored in the law. Opposed to this is the contention of defendant that the word "When" as used in Paragraph 28 is not an adverb, but is a conjunction and means "if" or "in case" or "in the event that." We think it is used as a subordinating conjunction and as used is equivalent in meaning to "if." In this use it has meaning. To construe Paragraph 28 as plaintiff suggests would make the inclusion of this paragraph in the Sales Compensation Plan meaningless, inasmuch as Paragraph 9 of the Sales Compensation Plan provides that "Commissions and quota credits are earned when orders are shipped." If it was intended, as plaintiff contends, that plaintiff was to receive commissions on orders shipped after the termination of his employment, then Paragraph 28 could have been omitted, because Paragraph 9 provides for the payment of commissions when orders are shipped. Paragraph 28 did not postpone plaintiff's right to commission until the orders were shipped. We think and rule that Paragraph 28 terminated plaintiff's employment as of the date of his discharge and terminated his right to commissions on any orders he may have procured that were shipped thereafter. While such a provision in the contract may seem harsh under the construction we have given it, it must be remembered that plaintiff accepted all of the benefits under the contract, and, therefore, as we said heretofore, can not escape provisions not beneficial to him.

We find that the trial court properly sustained defendant's motion for judgment in accordance with its motion for a directed verdict and, therefore, the judgment should be affirmed. It is so ordered.

WOLFE, P. J., and ANDERSON, J., concur.